**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 21-1994**

---

WINSTON TYLER HENCELY,

> Plaintiff – Appellant,

v.

FLUOR CORPORATION; FLUOR ENTERPRISES, INC.; FLUOR INTERCONTINENTAL, INC.; FLUOR GOVERNMENT GROUP INTERNATIONAL, INC.,

> Defendants – Appellees.

---

Appeal from the United States District Court for the District of South Carolina, at Greenville.  Bruce H. Hendricks, District Judge.  (6:19-cv-00489-BHH)

---

Argued:  March 10, 2022                    Decided:  October 30, 2024

---

Before AGEE, RUSHING, and HEYTENS, Circuit Judges.

---

Affirmed by published opinion.  Judge Rushing wrote the opinion, in which Judge Agee joined.  Judge Heytens wrote an opinion concurring in part and dissenting in part.

---

**ARGUED:**  Robert Henry Snyder, Jr., CANNELLA SNYDER LLC, Decatur, Georgia, for Appellant.  Daniel L. Russell, Jr., COVINGTON & BURLING LLP, Washington, D.C., for Appellees.  **ON BRIEF:**  James E. Butler, Jr., BUTLER WOOTEN & PEAK LLP, Atlanta, Georgia; W. Andrew Bowen, Paul Painter, III, BOWEN PAINTER, LLC, Savannah, Georgia; Beattie Ashmore, BEATTIE B. ASHMORE, P.A., Greenville, South Carolina; D. Josev Brewer, THE LAW OFFICE OF D. JOSEV BREWER, Greenville, South Carolina, for Appellant.  Andrew A. Mathias, Konstantine P. Diamaduros, NEXSEN

PRUET, LLC, Greenville, South Carolina; Raymond B. Biagini, COVINGTON & BURLING LLP, Washington, D.C., for Appellees.

_____

RUSHING, Circuit Judge:

This lawsuit arises out of a 2016 suicide bombing at the United States military base at Bagram Airfield in Afghanistan. The bomber was employed on base by a private military contractor, which provided support services to the armed forces. He is suspected to have constructed an explosive vest while working unsupervised during his night shift and, on the morning of the attack, made his way undetected to a crowded location where he detonated the device.

An American soldier wounded in the attack sued the contractor under South Carolina law, alleging that the contractor's supervision, entrustment, and retention of the bomber were negligent. He also alleged the contractor breached its contract with the U.S. Government.

The district court granted judgment to the contractor on all claims. The court concluded that federal law preempted the plaintiff's tort claims and that he was not a third-party beneficiary entitled to enforce the Government's contract. After careful review, we affirm.

I.

A.

The plaintiff, Specialist Winston Tyler Hencely, is a former soldier in the U.S. Army. In 2016, Hencely was stationed at Bagram Airfield, formerly the largest U.S. military base in Afghanistan, as part of Operation Freedom's Sentinel.

The defendant, Fluor Corporation, had a contract with the U.S. Department of Defense to provide base life support services and theater transportation mission functions

to U.S. and coalition forces in Afghanistan, including at Bagram Airfield. These services included, among other things, construction, facilities management, laundry, food, recreation, and, relevant here, vehicle maintenance and hazardous materials management.

The suicide bomber, Ahmad Nayeb, was an Afghan national. He was employed by a Fluor subcontractor and worked the night shift at the hazardous materials section of the non-tactical vehicle yard at Bagram Airfield. Nayeb was hired pursuant to the "Afghan First" program. This program was part of the United States' counterinsurgency strategy in Afghanistan, with the goal of "developing the Afghan economy" and fostering a "moderate, stable, and representative Afghanistan capable of controlling and governing its territory." J.A. 3041. One aspect of the program involved training and employing Afghans for "jobs being performed by contracted personnel, [Department of Defense] civilians, and even US military personnel." J.A. 3042. In accordance with the Afghan First program, Fluor's contract with the U.S. Government obligated it to hire Afghans—referred to as "Local Nationals" or "Host Nationals"—"to the maximum extent possible." J.A. 3048 ¶ 01.07(b). Fluor subcontracted with a labor broker to hire Local Nationals, including Nayeb, to work at Bagram Airfield. The Army sponsored Nayeb's hiring.

B.

By way of background, "[s]ince the United States began its military operations in Afghanistan and Iraq in 2001 and 2003, respectively, the U.S. military has depended heavily on contractors to support its mission." *In re: KBR, Inc., Burn Pit Litig.*, 893 F.3d 241, 253 (4th Cir. 2018). Indeed, contractors often comprised the majority of the U.S. Department of Defense's presence in Afghanistan. *See* Heidi M. Peters, CONG. RSCH.

SERV., RL44116, *Department of Defense Contractor and Troop Levels in Afghanistan and Iraq: 2007–2020* 1 (2021). The Army's contracting program is called the Logistics Civil Augmentation Program, or "LOGCAP" for short. This case involves the fourth generation of the program, LOGCAP IV. The military executes LOGCAP IV through "task orders," which incorporate "statements of work" defining a contractor's responsibilities.

The Department of Defense entered its LOGCAP IV contract with Fluor in 2007. Two years later, Fluor was awarded Task Order 0005, which included Fluor's work in the eastern and northern sections of Afghanistan. Task Order 0005 was governed by a Performance Work Statement (PWS). As relevant here, the PWS required Fluor to "provide all necessary personnel, supervision, [and] management . . . required in support of this [Task Order]." J.A. 3053 ¶ 03.03(a). The PWS elsewhere stated that Fluor "shall provide the necessary personnel with appropriate skills" to perform the contracted services; that Fluor "is responsible for ensuring all personnel supporting this [Task Order] comply with the standards of conduct" and all contract terms and conditions; and that Fluor "shall provide the necessary supervision for personnel required to perform this contract." J.A. 3048 ¶ 01.07(a).

As mentioned, the PWS also obligated Fluor to "hire [Local National] personnel and Subcontractors to the maximum extent possible in performance of this contract." J.A. 3048 ¶ 01.07(b). Fluor was "responsible for oversight of such personnel or Subcontractors to ensure compliance with all terms of the [contract]." J.A. 3048 ¶ 01.07(b).

In addition to these contractual obligations, Fluor was required to comply with the military's force protection and base security policies at Bagram Airfield. We turn to those policies next.

C.

Base security and force protection were the military's responsibility at Bagram Airfield. The military controlled base entry and exit, as well as security inside the perimeter. Regarding Local Nationals in particular, the military in some cases identified and sponsored certain individuals for training and employment at Bagram Airfield and in all cases vetted and approved each Local National for employment on base. The military established screening protocols which required that Local Nationals be searched before entering the base at Entry Control Points. Inside the perimeter, the military employed bomb-sniffing dogs and random searches of Local Nationals and physical areas throughout the base. The military also conducted periodic counterintelligence interviews of Local Nationals to determine whether they should continue to receive access to the base.

As part of its security and force protection measures, the military established and enforced protocols regarding supervision of the Local National workforce on base. These protocols were set forth in an official policy document—the Bagram Airfield Badge, Screening, and Access Policy—and subject to change at the discretion of the Bagram Support Group (BSG) Commander. Fluor was required to follow the military's protocols for supervising its Local National employees.

Pursuant to this policy, the Force Protection Screening Cell, under the direction of the BSG Commander, granted base-access badges to non-uniformed personnel, including

Local Nationals. The badge color determined the wearer's level of access and need for supervision while on base. Red badges were the default for Local Nationals and provided the wearer with the least amount of access. According to the policy in effect at the time of the suicide bombing, a Local National with a red badge required an escort in all areas of Bagram Airfield except his work facility. Escorts were required to "continuously monitor" the individuals they were escorting, remaining "in close proximity" and "in constant view" of them. J.A. 2892–2893 (internal quotation marks omitted). The BSG Commander could authorize qualifying Local Nationals to hold a yellow badge, which represented an increase in base access. Yellow badge holders were authorized to travel unescorted at Bagram Airfield and were permitted to escort up to ten other Local Nationals.[1]

The military's security policies also regulated the items that Local Nationals were permitted to use while on base. For example, the military prohibited Local Nationals from possessing cameras or using networked computers, and the military forbade Local Nationals from carrying cellular phones without permission from the BSG Commander. The policies did not, however, restrict Local Nationals' access to tools.

For obvious reasons, the military required Fluor's strict compliance with its base security and force protection policies, including the badge and escort protocols for supervising Local National employees. The military operated a surveillance system

---

[1] Within weeks of the attack, the military changed its base security protocols. Among other things, the updated policy eliminated yellow badges, making restrictive red badges the only authorized badge for Local Nationals, and it prohibited Local Nationals from escorting other Local Nationals at Bagram Airfield. The military also changed the policy to require constant escort of red badge holders, "eliminat[ing] the exemption that allowed Local Nationals to operate unescorted within their workplace." J.A. 2953.

throughout Bagram Airfield to monitor, among other things, Fluor's compliance with the escort protocols. And on a regular basis, the military conducted feedback sessions to compare Fluor's self-reporting with the military's surveillance and give Fluor an opportunity to correct any deficient performance. It is undisputed that, before the bombing, Fluor had proposed providing additional escort supervision of Local Nationals while at their work facilities, but the Army rejected that proposal. *See*, *e.g.*, J.A. 3698 (explaining that "the price tag was going to be excessive").

### D.

The bombing occurred early in the morning on November 12, 2016, a few hundred meters from the starting line for a Veterans Day 5K race at Bagram Airfield. Hencely and others observed Nayeb approaching and confronted him. Nayeb then detonated an explosive vest he was wearing under his clothes, killing himself and five others and severely wounding seventeen more, including Hencely. The Taliban took credit for the attack, claiming it had been planned for months.

After the bombing, the military conducted a formal investigation under Army Regulation 15-6, or "AR 15-6" for short. The military issued its AR 15-6 report on December 31, 2016. A heavily redacted version of that report was produced in this litigation.[2]

---

[2] Hencely moved *in limine* for an order deeming the redacted AR 15-6 report as admissible into evidence. Fluor opposed the motion, arguing among other things that the report is unreliable, contains hearsay, and is materially incomplete. The district court denied Hencely's motion without prejudice, concluding it could not "pass on the admissibility of a government report that neither it, nor the parties have seen in a form that

The AR 15-6 investigation revealed that the military knew Nayeb was a former Taliban member. Believing Nayeb had renounced his ties to the insurgency, the military had sponsored him for employment as an effort at reintegration. The military vetted Nayeb and granted him access to Bagram Airfield with a red badge. The military also conducted several counterintelligence screening interviews with Nayeb over his five years of employment on base. According to the AR 15-6 report, Nayeb's answers to counterintelligence questions appeared "trained and coached" during an interview in March 2016, several months before the bombing, which in hindsight was a "missed indicator" of the threat Nayeb posed to the military's operations at Bagram Airfield. J.A. 2943. The investigation further revealed that, the night before the bombing, intelligence indicated that an attack was imminent. Fluor did not have access to this military intelligence, nor did the military inform Fluor about Nayeb's Taliban ties.

According to the AR 15-6 investigation, Nayeb likely built his bomb vest while inside the military base, working as the sole employee on the night shift at the hazardous materials work center in the non-tactical vehicle yard, with only sporadic supervision. He likely smuggled homemade explosives through security onto the base and then used supplemental materials and tools available on base to construct the bomb vest. For example, Nayeb checked out tools unassociated with his duties in the hazardous materials work center, including a tool called a multimeter, which measures voltage, current, and resistance.

---

is even close to complete." J.A. 3907. Hencely did not appeal that ruling. Both parties nevertheless discuss the substance of the AR 15-6 report on appeal.

On the morning of the attack, Nayeb was supposed to have been escorted by Fluor personnel on a bus ride to an Entry Control Point, where the military would then escort him off base. At the non-tactical vehicle yard, a Local National coworker signed out Nayeb and the other Local National employees at the end of the night shift. At the bus, a Local National with a yellow badge and escort responsibilities vouched that all Local Nationals, including Nayeb, were accounted for and the bus could leave. But according to the AR 15-6 report, Nayeb told a Local National coworker that he would miss the bus because he needed to attend a hazardous materials class, which was a lie. The report concluded that Nayeb likely did not board the bus but instead walked for 53 minutes, undetected, to the blast site.

In its AR 15-6 report, the military determined "the primary contributing factor" to the attack was "Fluor's complacency and its lack of reasonable supervision of its personnel." J.A. 2917. The report criticized Fluor for lending Nayeb tools his job didn't require, not adequately supervising Nayeb while he worked in the hazardous materials work center, and retaining Nayeb despite reported instances of sleeping on the job and absences without authority. The report also faulted Fluor for deficient performance of its escort duties between the non-tactical vehicle yard and the Entry Control Point. The Army concluded that Fluor "did not comply" with its contractual obligations regarding "supervision of local national . . . labor and adherence to escort requirements," but declined to terminate Fluor's contract. J.A. 3293.

E.

Hencely sued Fluor in the U.S. District Court for the District of South Carolina. His amended complaint is the operative pleading. It alleges that under South Carolina law Fluor was negligent in supervising Nayeb at his worksite and escorting Nayeb the morning of the attack, negligent in entrusting tools like a multimeter to Nayeb, and negligent in retaining Nayeb despite the "unreasonabl[e] danger[]" he presented. J.A. 1661. The amended complaint further alleges vicarious liability, negligent control, and breach of contract, specifically breach of the LOGCAP IV contract, Task Order 0005, and the PWS. In addition to punitive damages, the amended complaint seeks compensatory damages for medical expenses, pain and suffering, and lost income. Fluor denied liability and asserted several defenses faulting the military for Hencely's injuries, including contributory and comparative negligence.

Three dispositive motions filed by Fluor are relevant to this appeal. First, Fluor moved to dismiss all of Hencely's claims as nonjusticiable under the political question doctrine. The district court denied that motion and ordered discovery to proceed. *See Hencely v. Fluor Corp., Inc.*, No. 6:19-cv-00489-BHH, 2020 WL 2838687 (D.S.C. June 1, 2020). Subsequently, Fluor moved for judgment on the pleadings regarding Hencely's breach of contract claim. The district court granted that motion, agreeing with Fluor that Hencely is not a third-party beneficiary of LOGCAP IV or the related agreements. *See Hencely v. Fluor Corp.*, No. 6:19-cv-00489-BHH, 2021 WL 3604781 (D.S.C. Aug. 13, 2021). And finally, Fluor moved for summary judgment on all remaining claims, arguing that the Federal Tort Claims Act's "combatant activities" exception preempts the state tort

11

laws undergirding those claims.  The district court agreed and granted summary judgment in Fluor's favor.  *See Hencely v. Fluor Corp.*, 554 F. Supp. 3d 770 (D.S.C. 2021).

Hencely timely appealed the orders dismissing his claims.  In addition to defending the district court's judgments, Fluor also reasserts its position that the political question doctrine bars judicial resolution of Hencely's complaint.  We have appellate jurisdiction under 28 U.S.C. § 1291.

## II.

We begin with the political question doctrine, which implicates our authority to decide this dispute.[3]  The political question doctrine is a "narrow exception" to the general rule that "the Judiciary has a responsibility to decide cases properly before it."  *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 194–195 (2012).  A controversy involves a political question "'where there is a textually demonstrable constitutional commitment of the issue to a coordinate political department'" or "'a lack of judicially discoverable and manageable standards for resolving it.'"  *Id.* at 195 (quoting *Nixon v. United States*, 506 U.S. 224, 228 (1993)).

"'Most military decisions are matters solely within the purview of the executive branch'" and therefore present nonjusticiable political questions.  *In re: KBR, Inc., Burn Pit Litig.*, 893 F.3d 241, 259 (4th Cir. 2018) (quoting *Al Shimari v. CACI Premier Tech.*,

---

[3] Our Court has characterized the political question doctrine as an issue of subject matter jurisdiction.  *See Al Shimari v. CACI Premier Tech., Inc.*, 840 F.3d 147, 154–155 (4th Cir. 2016); *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 407 n.9 (4th Cir. 2011).  "Jurisdictional defects can be raised at any time," *Stewart v. Iancu*, 912 F.3d 693, 701 (4th Cir. 2019), and Hencely does not object to Fluor raising the matter in its Response Brief rather than filing a cross-appeal from the district court's unfavorable ruling.

*Inc.*, 758 F.3d 516, 533 (4th Cir. 2014)).  "[T]he Constitution delegates authority over military affairs to Congress and to the President as Commander in Chief."  *Lebron v. Rumsfeld*, 670 F.3d 540, 548 (4th Cir. 2012).  "It contemplates no comparable role for the judiciary," and "judicial review of military decisions would stray from the traditional subjects of judicial competence."  *Id.*

Given the modern military's reliance on contractors to support its mission, we have recognized that "a military contractor acting under military orders can also invoke the political question doctrine as a shield under certain circumstances."  *Burn Pit Litig.*, 893 F.3d at 259.  But "acting under orders of the military does not, in and of itself, insulate the claim from judicial review."  *Taylor v. Kellogg Brown & Root Servs., Inc.*, 658 F.3d 402, 411 (4th Cir. 2011).  We have held that a suit against a military contractor raises a nonjusticiable political question if either (1) the military exercised direct control over the contractor, or (2) "national defense interests were closely intertwined with military decisions governing the contractor's conduct, such that a decision on the merits of the claim would require the judiciary to question actual, sensitive judgments made by the military."  *Al Shimari*, 840 F.3d at 155 (internal quotation marks omitted); *see Taylor*, 658 F.3d at 411.

Under the first prong, "a suit against a military contractor presents a political question if the military exercised direct control over the contractor," meaning the military's control was "plenary" and "actual."  *Burn Pit Litig.*, 893 F.3d at 260.  The military's control is not plenary if the military "provides the contractor with general guidelines" yet leaves the contractor "discretion to determine the manner in which the contractual duties would

be performed." *Id.* (internal quotation marks omitted). Instead, to be plenary, the "military's control over the government contractor must rise to the level of the military's control over the convoy in" *Carmichael v. Kellogg, Brown & Root Services, Inc.*, 572 F.3d 1271 (11th Cir. 2009). *Burn Pit Litig.*, 893 F.3d at 260. In *Carmichael*, a fuel truck driven by a contractor employee as part of a military convoy on a fuel resupply mission rolled over and injured the plaintiff. *See Carmichael*, 572 F.3d at 1278. The Eleventh Circuit "held that the military's control was plenary, because 'the military decided the particular date and time for the convoy's departure; the speed at which the convoy was to travel; the decision to travel along a particular route[;] how much fuel was to be transported; the number of trucks necessary for the task; the speed at which the vehicles would travel; the distance to be maintained between vehicles; and the security measures that were to be taken.'" *Burn Pit Litig.*, 893 F.3d at 260 (quoting *Carmichael*, 572 F.3d at 1281). Applying that standard in *Burn Pit Litigation*, our Court concluded that the military's control over a contractor's waste management was plenary because the contractor "had little to no discretion in choosing *how* to manage the waste." *Id.* at 261. "The military mandated the use of burn pits" and controlled "where to construct the burn pits, what could or could not be burned, when [the contractor] could operate the burn pits, how high the flames should be, and how large each burn should be." *Id.* In other words, every "'critical determination[] was made exclusively by the military,'" such that the contractor's decisions were "'de facto military decisions.'" *Id.* (first quoting *Carmichael*, 572 F.3d at 1282, then quoting *Taylor*, 658 F.3d at 410).

14

The record here does not satisfy our rigorous standard for plenary control. Even though the military dictated the security measures for Bagram Airfield, required Fluor to comply with military protocols concerning the supervision and escort of Local Nationals on base, and decided which Local Nationals Fluor could retain, the level of control the military exercised over Fluor's conduct does not to rise to that of the convoy in *Carmichael*. For example, viewing the evidence in the light most favorable to Hencely, the decision to lend Nayeb a multimeter from Fluor's tool room was not "made exclusively by the military" or a "de facto military decision." *Id.* (internal quotation marks omitted). On the current record, therefore, the military's control cannot be considered "plenary," and we need not separately address whether it was "actual." *See Burn Pit Litig.*, 893 F.3d at 260.

Under the second prong of our Circuit's test, we must dismiss a case as nonjusticiable if "national defense interests were closely intertwined with military decisions governing the contractor's conduct, such that a decision on the merits of the claim would require the judiciary to question actual, sensitive judgments made by the military." *Al Shimari*, 840 F.3d at 155 (internal quotation marks omitted). In making this assessment, we "look beyond the complaint, and consider how [Hencely] might prove his claim *and* how [Fluor] would defend." *Taylor*, 658 F.3d at 409 (internal quotation marks and brackets omitted).

We have held that a contractor's "causation defense"—by which it argues that military decisions, not the contractor's actions, caused the plaintiff's injury—"does not require evaluation of the military's decision making unless (1) the military caused the [plaintiff's] injuries, at least in part, and (2) the [plaintiff] invoke[s] a proportional-liability

system that allocates liability based on fault." *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 340–341 (4th Cir. 2014). In other words, a defense that lays the blame for the plaintiff's injuries on military decisions does not raise a political question if it "does not necessarily require the district court to evaluate the propriety of" those military judgments. *Id.* at 340. And a district court is not inevitably required to evaluate the reasonableness of military judgments if the underlying state law (which forms the basis for the negligence claims and defenses) does not actually require the court to assign fault to the military's actions. *Compare id.* (reasoning that contractor's "proximate causation defense" would not necessarily require court to evaluate the reasonableness of military decisions), *with Taylor*, 658 F.3d at 411 (concluding that contributory negligence defense would "invariably require the Court to decide whether the Marines made a reasonable decision," and therefore raised a political question (internal quotation marks and ellipsis omitted)).

Fluor argues that its "causation defense—i.e., trying the Military as the 'empty chair' and establishing that pivotal Military judgments caused Plaintiff's injuries"—would require the factfinder to evaluate the reasonableness of military decisions. Response Br. 50. Our precedent compels us to conclude otherwise. South Carolina law, which the parties have assumed applies to Hencely's negligence claims and to Fluor's defenses,[4] prohibits a jury from assigning fault to an immune nonparty. *See Machin v. Carus Corp.*,

---

[4] On appeal, Fluor faults the district court for "assuming application of South Carolina law *without* conducting a choice-of-law analysis," which it says would "lead to Afghan law" as the law of the place where the injury occurred. Response Br. 52–53. But Fluor itself has invoked South Carolina law throughout this litigation. And Fluor has not provided any indication in its brief how the outcome would be different under Afghan law.

799 S.E.2d 468, 478 (S.C. 2017) ("[A] nonparty may be included in the allocation of fault only where such person or entity is a 'potential tortfeasor,' which, under our law, excludes [a third party] who is immune from suit[.]").  And it is undisputed that the military is an immune nonparty.  *See* 28 U.S.C. § 2680(j); *Feres v. United States*, 340 U.S. 135, 146 (1950) ("[T]he Government is not liable under the Federal Tort Claims Act for injuries to servicemen where the injuries arise out of or are in the course of activity incident to service."); *Brame v. Garner*, 101 S.E.2d 292, 294 (S.C. 1957) (acknowledging that the military is immune from suit).  Accordingly, although Fluor's defense may require the district court "to decide if the military made decisions" that caused Hencely's injuries, it "does not necessarily require the district court to evaluate the propriety of [those] judgments" because the court cannot assign fault to the military.  *Burn Pit Litig.*, 744 F.3d at 340.

Fluor emphasizes that courts lack standards to evaluate "when it is 'reasonable' to allow a known terrorist inside a secure Military facility," or "what level of supervision or escorting is 'reasonable' given the Military's competing demands, resource limits, and policy objectives."  Response Br. 49; *cf.*, *e.g.*, *Taylor*, 658 F.3d at 412 n.13 ("[W]e have no discoverable and manageable standards for evaluating how electric power is supplied to a military base in a combat theatre or who should be authorized to work on the generators supplying that power."); *Tiffany v. United States*, 931 F.2d 271, 279 (4th Cir. 1991) ("Judges have no 'judicially discoverable and manageable standards for resolving' whether necessities of national defense outweigh risks to civilian aircraft." (quoting *Baker v. Carr*, 369 U.S. 186, 217 (1962)).  While it is certainly true that courts are not equipped or

authorized to evaluate the military's "delicate appraisals of relative dangers," *Tiffany*, 931 F.2d at 278, it does not yet appear that litigating Hencely's negligence claims and Fluor's defenses would "invariably require" the factfinder to judge whether the military's decisions were *reasonable*, as opposed to evaluating only whether those decisions caused Hencely's injuries, *Burn Pit Litig.*, 744 F.3d at 340 (internal quotation mark omitted). That is where our Court has drawn the line for justiciability under this second prong of our military contractor political question test.

In sum, while the question may be closer than the district court's pre-discovery ruling suggested, we are not convinced that deciding Hencely's case would cause the court to "inevitably be drawn into a reconsideration of military decisions." *Lane v. Halliburton*, 529 F.3d 548, 563 (5th Cir. 2008). The political question doctrine therefore poses no bar to judicial review of the merits of this dispute.

III.

We turn now to the heart of this appeal: federal preemption of Hencely's negligence claims. The district court held that uniquely federal interests represented by the Federal Tort Claims Act's combatant activities exception displaced Hencely's state-law claims for negligent supervision, entrustment, escort, and retention. We review the district court's judgment de novo, applying the same summary judgment standard that court was required to apply. *Calloway v. Lokey*, 948 F.3d 194, 201 (4th Cir. 2020); *see also* Fed. R. Civ. P. 56(a).

18

A.

In the Federal Tort Claims Act (FTCA), "Congress authorized damages to be recovered against the United States for harm caused by the negligent or wrongful conduct of Government employees, to the extent that a private person would be liable under the law of the place where the conduct occurred." *Boyle v. United Tech. Corp.*, 487 U.S. 500, 511 (1988); *see* 28 U.S.C. § 1346(b).  It exempted from this consent to suit, however, "[a]ny claim arising out of the combatant activities of the military or naval forces, or the Coast Guard, during time of war."  28 U.S.C. § 2680(j).  By their terms, these provisions do not apply to government contractors.  28 U.S.C. § 2671.  Nevertheless, the combatant activities exception reflects an important federal policy of "foreclos[ing] state regulation of the military's battlefield conduct and decisions."  *Burn Pit Litig.*, 744 F.3d at 348 (internal quotation marks omitted).

As the Supreme Court has explained, in areas involving "uniquely federal interests," an FTCA exception can demonstrate "the potential for, and suggest[] the outlines of, significant conflict between federal interests and state law" sufficient to warrant federal preemption even absent a statutory directive or direct conflict.  *Boyle*, 487 U.S. at 504, 507, 511 (internal quotation marks omitted).  In *Boyle*, for instance, the Supreme Court held that the policy reflected in the FTCA's discretionary function exception, 28 U.S.C. § 2680(a), preempted and barred a plaintiff's state-law design-defect claim against the manufacturer of a military helicopter built for the United States.  487 U.S. at 512–513.

Recognizing the conflict between federal and state interests in the realm of warfare, several federal circuit courts, including our own, have extended *Boyle*'s logic to the

FTCA's combatant activities exception. *See Saleh v. Titan Corp.*, 580 F.3d 1, 9 (D.C. Cir. 2009); *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 127–128 (2d Cir. 2021); *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 480–481 (3d Cir. 2013); *Burn Pit Litig.*, 744 F.3d 326, 350–351 (4th Cir. 2014); *Koohi v. United States*, 976 F.2d 1328, 1337 (9th Cir. 1992). As our Court has explained, however, the conflict between federal and state interests in this context "is much broader" than the discrete inconsistency between federal and state duties in *Boyle*. *Burn Pit Litig.*, 744 F.3d at 349 (internal quotation marks omitted). "Instead, when state tort law touches the military's battlefield conduct and decisions, it inevitably conflicts with the combatant activity exception's goal of eliminating such regulation of the military during wartime." *Id.* In other words, when it comes to warfare, "'the federal government occupies the field'" and "'its interest in combat is always precisely contrary to the imposition of a non-federal tort duty.'" *Id.* (quoting *Saleh*, 580 F.3d at 7).

We have adopted the D.C. Circuit's test in *Saleh* to ensure preemption when state tort laws would clash with the federal interest underlying the combatant activities exception. *See Burn Pit I*, 744 F.3d at 351. Pursuant to this test, "'[d]uring wartime, where a private service contractor is integrated into combatant activities over which the military retains command authority, a tort claim arising out of the contractor's engagement in such activities shall be preempted.'" *Id.* at 349 (quoting *Saleh*, 580 F.3d at 9).

The military "need not maintain 'exclusive operational control' over the contractor for the government to have an interest in immunizing a military operation from suit." *Id.* (quoting *Saleh*, 580 F.3d at 8–9). This test therefore allows "the contractor to exert '*some*

20

limited influence over an operation,' as long as the military 'retain[s] command authority.'"[5] *Id.* (quoting *Saleh*, 580 F.3d at 8–9). At the same time, it leaves open the possibility that a contractor might "supply[] services in such a discrete manner" that those services could be judged by state tort law without touching the military's battlefield conduct and decisions, analogous to a contractor who, in its "sole discretion," chooses specifications for a product it then sells to the Government. *Saleh*, 580 F.3d at 9.

B.

Hencely does not contest that, applying this Court's precedent, Fluor was "integrated into combatant activities" at Bagram Airfield. *Burn Pit Litig.*, 744 F.3d at 351. We view "combatant activities" through a "broad[] lens" to include "not only physical violence, but activities both necessary to and in direct connection with actual hostilities." *Id.* at 351 (internal quotation marks omitted). For example, in *Burn Pit Litigation*, we held that "waste management and water treatment functions to aid military personnel in a combat area [are] undoubtedly" combatant activities. *Id.* We agree with Hencely that Fluor was engaged in combatant activities at Bagram Airfield and that the particular activity at issue in Hencely's lawsuit—supervising Local National employees on a military base in a theater of war—so qualifies.

We also conclude that "the military retained command authority" over Fluor's supervision of Local National employees on the base. *Id.* (internal quotation marks and

---

[5] The military's ultimate command authority over a combatant activity for purposes of preemption is accordingly distinguished from direct plenary control as envisioned by our political question jurisprudence, under which the contractor's determinations are actual or de facto military decisions.

brackets omitted).  To begin, the Army instructed Fluor to hire Local Nationals as part of advancing the military's counterinsurgency strategy in Afghanistan, specifically the Afghan First Program.  The military then reserved for itself decisions about containing the security threat posed by hiring Local Nationals to work on the military base.  In particular, the Army decided which Local Nationals could access the base for employment and the Army dictated when, where, and how Fluor must escort and supervise each of those Local National employees.

The military, independent of Fluor, screened and approved Local Nationals for employment.  The military vetted Nayeb and, knowing his history as a Taliban member, sponsored him for employment and granted him access to Bagram Airfield as a strategic effort at reintegration.  The military periodically conducted security screening interviews of Local Nationals to determine whether their base access privileges should be terminated.  The military interviewed Nayeb for security purposes at least seven times before and during his employment and each time decided he should retain base access for continued employment.  Those judgments belonged to the military alone.

Like with hiring, the military controlled base security, including entry and exit.  Local Nationals could not enter the base without a military-issued badge.  The military required physical searches and biometric screening of Local Nationals entering the base at Entry Control Points.  Inside the perimeter, the military used bomb-sniffing dogs and performed random searches of Local Nationals and physical areas throughout the base.  When Local Nationals arrived back at Entry Control Points after their shifts, the military

escorted them off the base.  As Hencely's counsel put it, "the military had effective command over security on the base."  Oral Argument at 40:10.

As part of its mandate over base security, the military exercised comprehensive command over Fluor's supervision of Local Nationals' on-base movements and activities. Military protocols specified the items Local Nationals were forbidden to possess or use, like two-way radios and cameras.  The military dictated whether, when, and how each Local National must be escorted while on base, and the military decided who had escort authority.  For red badge holders like Nayeb, the military required an escort to "remain in close proximity and remain in constant view" of the Local National "in all areas" of Bagram Airfield "except [the] work facility."  J.A. 2892–2893 (internal quotation marks and emphases omitted).  The military's authority over escorting is illustrated by its rejection of Fluor's proposal, before the bombing, to provide constant escort supervision of Local Nationals, even at their worksites.[6]  Fluor could make a proposal, but the Army made the decisions.  The military required Fluor to follow its escort protocols, trained Fluor personnel with escort duties, and operated a surveillance system to monitor and enforce Fluor's compliance.

The military's command authority over Local National employment and supervision at Bagram Airfield is further demonstrated by the changes it quickly—and unilaterally—instituted after the bombing.  Within weeks of the bombing, the military

---

[6] Viewing the facts and all reasonable inferences in the light most favorable to Hencely, as we must, *see Ballengee v. CBS Broadcasting, Inc.*, 968 F.3d 344, 349 (4th Cir. 2020), we do not infer from this rejection that the Army forbade Fluor from supervising the work of its Local National employees.

altered its base security policies to require increased supervision of Local Nationals. Most notably, the new protocols required *all* Local Nationals to be escorted *at all times* while on base, removing the exception for when Local Nationals were at their worksite and entirely eliminating yellow badges (which did not require an escort and had been permitted to escort other Local Nationals). Military authorities also made the decision to greatly reduce the number of Local Nationals on base to around one hundred. As a result, the military sent well over 1,000 Local Nationals packing, ending their employment at Bagram Airfield.

The fact that Fluor possessed some discretion when operating within this framework does not eliminate the conflict between state tort law and federal interests presented here. Viewing the facts and all reasonable inferences in the light most favorable to Hencely, *see Ballengee*, 968 F.3d at 349, we will infer that (1) Fluor could decline to lend its employees tools it didn't think they needed to complete their jobs, even if the Army didn't forbid Local Nationals from possessing those tools, and (2) Fluor could monitor its employees' work and fire them for poor performance, even if they were Local Nationals sponsored by the military and approved for base access. The military nevertheless retained ultimate command authority over supervision of Local Nationals and the protocols necessary to mitigate the risk posed by their presence on base. *See Burn Pit Litig.*, 744 F.3d at 349 (explaining that the *Saleh* test "allow[s] the contractor to exert '*some* limited influence over an operation,' as long as the military 'retain[s] command authority'" (quoting *Saleh*, 580 F.3d at 8–9)). Based on the military's assessment of the security threat presented by any given Local National, the military would authorize employment at Bagram Airfield or terminate it, the military dictated when and how the Local National must be supervised,

and the military decided what items the Local National should be forbidden to use. Imposing state tort concepts of reasonableness onto Fluor's supervision of Local Nationals pursuant to these military directives would inevitably "touch[] the military's battlefield conduct and decisions" and even invite "'judicial probing of the government's wartime policies.'" *Burn Pit Litig.*, 744 F.3d at 349 & n.11 (quoting *Saleh*, 580 F.3d at 8); *see also Saleh*, 580 F.3d at 8 ("Such proceedings, no doubt, will as often as not devolve into an exercise in finger-pointing between the defendant contractor and the military . . . .").

This is not a situation where Fluor "suppl[ied] services in such a discrete manner" that its "services could be judged separate and apart from" the combatant activities and decisions of the United States military. *Saleh*, 580 F.3d at 9. To the contrary, the Army instructed Fluor to hire Local Nationals, directed where and how Fluor must escort and supervise Local Nationals, and decided whether Local Nationals could continue to access the base for employment. Fluor's exercise of its limited discretion concerning Local Nationals occurred within strictures set by the military based on its priorities and risk assessments. Hencely responds that Fluor could comply with state tort duties *and* the military's directives. For example, Fluor could have denied Nayeb access to a multimeter without violating the military's policy forbidding Local Nationals to use certain items. But that argument overlooks the "more general" nature of "battle-field preemption." *Saleh*, 580 F.3d at 7. "In the context of the combatant activities exception, the relevant question is not so much whether the substance of the federal duty is inconsistent with a hypothetical duty imposed by the state." *Id.* "Rather, it is the imposition *per se* of the state . . . tort law that conflicts" with the federal policy of eliminating such regulation of the military during

wartime.[7]  *Id.*; *see Burn Pit Litig.*, 744 F.3d at 349.  Our "ultimate military authority" test reflects the breadth of this displacement of state law.  *Saleh*, 580 F.3d at 12; *see also Burn Pit Litig.*, 744 F.3d at 351 (state tort law is preempted "when it affects activities stemming from military commands").  Because the military retained command authority over the supervision of Local Nationals at Bagram Airfield, a combatant activity into which Fluor was undisputedly integrated, Hencely's tort claims arising out of such activities are preempted.

Hencely raises three additional arguments regarding preemption.  First, he contends that Fluor's contract with the Army was a performance-based statement of work and did "not provide any direction to Fluor about how it was to supervise its workers."  Opening Br. 34.  He likens this case to *Harris*, where the Third Circuit held that a performance-based statement of work defeated preemption because, by defining the contractor's duties for maintaining barracks electrical systems in terms of results rather than processes, the military did not retain command authority over the contractor's performance of the contract.  *See* 724 F.3d at 481–482.

As an initial matter, our Court has not treated a performance-based statement of work as fatal to a combatant activities preemption defense.  Indeed, we adopted our preemption rule in a case involving a performance-based LOGCAP contract.  *See Burn Pit*

---

[7] As the *Saleh* court observed, the rationales for tort law, like "deterrence of risk-taking behavior," "are singularly out of place in combat situations, where risk-taking is the rule."  580 F.3d at 7.  That observation is equally true here, where the military took the calculated risk to bring Local Nationals, including known former insurgents, on base for employment in order to further its counterinsurgency strategy in Afghanistan.

*Litig.*, 744 F.3d at 332 (LOGCAP III); *Burn Pit Litig.*, 893 F.3d at 257 ("LOGCAP III was a performance-based contract").

More to the point, the PWS obligated Fluor to follow the military's base security protocols, which dictated processes, not merely results. Although the PWS assigned Fluor responsibility for "oversight of . . . personnel . . . to ensure compliance with" and performance of its contract, J.A. 394 ¶ 1.07(b), military protocols for Bagram Airfield—including the badge-and-escort policy—directed Fluor's supervision of Local Nationals in much greater detail. It was the military, as part of its command over base security, that established the requirements for supervising and escorting Local Nationals and was ultimately responsible for ensuring those requirements were followed. Hencely alleges that Fluor didn't keep eyes on Nayeb while he worked, didn't restrict his access to tools used to make the bomb, disregarded an "unreasonably dangerous" risk by retaining him, and failed to follow the military's escort protocols the morning of the attack. J.A. 1661. These are matters of base security over which the military maintained ultimate authority, not judgments about the quality of an employee's work in the non-tactical vehicle yard. The military decided which Local Nationals to permit and which to exclude at Bagram Airfield; how to screen for explosives and other threats at the base; which Local Nationals needed what levels of access and eyes-on escorting; if escorting was needed, the where, when, and how of such supervision; what items Local Nationals were not permitted to handle while on base; and what procedures were necessary to ensure Local Nationals exited the base. Although Fluor retained primary authority over monitoring its employees' contract performance, it did not have discretion to decide the terms of Local National

supervision necessary for base security.  The military did not give Fluor responsibility for determining how best to protect U.S. personnel from the risk posed by Fluor's Local National employees; the military commanded how that mission was performed.

Hencely next argues that preemption should not apply because he has alleged that Fluor did not follow Army instructions and failed to comply with its contractual obligations.  This argument misunderstands the nature of combatant activities preemption.  As we have previously explained, "the purpose of the combatant activities exception is not protecting contractors who adhere to the terms of their contracts; the exception aims to foreclose state regulation of the military's battlefield conduct and decisions." *Burn Pit Litig.*, 744 F.3d at 350 (internal quotation marks omitted).  Our preemption rule preserves the field of wartime decisionmaking exclusively for the federal government.  *Id.*; *see also Saleh*, 580 F.3d at 6.  That remains true in cases of "alleged contractor misconduct." *Burn Pit Litig.*, 744 F.3d 349 n.11 (internal quotation marks omitted).  Indeed, in *Burn Pit Litigation*, we explained that one reason for battlefield preemption is to avoid potential interference "'with the federal government's authority to punish and deter misconduct by its own contractors.'"  *Id.* (quoting *Saleh*, 580 F.3d at 8); *see also Saleh*, 580 F.3d at 5 (holding plaintiffs' tort claims preempted, including "allegations that [a contractor] breached its contract").

Finally, Hencely asserts that the Fluor employees and subcontractors who escorted Local Nationals were not "within the Army's chain of command."  Opening Br. 32.  As Fluor correctly notes, however, under Army regulations, no private services contractor is ever "part of the operational chain of command."  Army Reg. 715-9 ¶ 4-1.d (Mar. 2017);

*cf. id.* ("Commanders have direct authority over [contractors] working on military facilities for matters of administrative procedures and requirements, force protection, and safety of the force."). And as the *Saleh* test reflects, the pertinent inquiry is whether the military retained command authority over the combatant activities into which the contractor was integrated. *Burn Pit Litig.*, 744 F.3d at 349. Here, we are satisfied the military did retain such authority. Viewing the evidence in the light most favorable to Hencely, we conclude that the military retained command authority over supervision of Local Nationals at Bagram Airfield, and so Hencely's tort claims against Fluor arising out of that combatant activity are preempted.

## IV.

We turn, lastly, to Hencely's breach of contract claim, which is premised on the notion that he is an intended third-party beneficiary of the LOGCAP IV contract between Fluor and the United States. The district court rejected this argument and granted judgment for Fluor on the pleadings. *See* Fed. R. Civ. P. 12(c). Our review is de novo. *See Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014).

Generally, a motion for judgment on the pleadings should be granted only when "it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling him to relief." *Id.* (internal quotation marks omitted). In considering such a motion, "we accept as true all well-pleaded allegations and view the complaint in the light most favorable to the plaintiff," but we need not "accept as true the legal conclusions set forth in a plaintiff's complaint." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007) (internal quotation marks omitted); *see Drager*, 741 F.3d at

474. We can consider the LOGCAP IV contract, which Fluor attached to its motion and the parties agree is "integral to the complaint and authentic." *Trimble Navigation*, 484 F.3d at 705. While "the inquiry into third-party beneficiary status is fact sensitive," resolution of the issue on the pleadings is appropriate when, as here, "the relevant documents are properly before this Court" and the pleadings and agreements preclude the plaintiff's claim to third-party beneficiary status. *Id.* at 709.

"The appropriate test under federal common law for third-party beneficiary status is whether the contract reflects the express or implied intention of the parties to benefit the third party."[8] *Id.* at 706 (internal quotation marks omitted). "This intent may be determined by the contract itself, as well as the circumstances surrounding its formation." *Id.* (internal quotation marks omitted). Third-party beneficiary status "is exceptional in the law" and "should not be granted liberally." *Id.* (internal quotation marks omitted).

Our opinion in *Trimble Navigation* illustrates these principles. In that case, the United Kingdom sought to purchase auxiliary output chips from an American manufacturer. Given the sensitive nature of the product, federal law prohibited the foreign government from purchasing the chips directly from the American manufacturer and instead required the United Kingdom to contract with the United States, which, in turn, contracted with the manufacturer to purchase the product. When the chips proved less than

---

[8] The parties agree that federal common law governs Hencely's breach of contract claim. *See* 48 C.F.R. § 52.233-4 ("United States law will apply to resolve any claim of breach of this contract."); J.A. 2291 § I-115 (LOGCAP IV) (incorporating 48 C.F.R. § 52.233-4); *cf. Boyle*, 487 U.S. at 504 ("[O]bligations to and rights of the United States under its contracts are governed exclusively by federal law.").

satisfactory, the U.K. sued the manufacturer in federal court, claiming to be a third-party beneficiary of the contract between the manufacturer and the U.S.  We held otherwise. Among other things, we noted the absence of indicia that the U.S. or the manufacturer intended to benefit the U.K.  Specifically, we observed that the manufacturer's agreements with the U.S. "d[id] not explicitly mention that they [were] for the benefit of [the] UK." *Id.* at 708.  Nor did those agreements "mention . . . any involvement of [the] UK," such as approving the chips, "as a condition to [the manufacturer's] receipt of payment" from the U.S.  *Id.*  Although the agreement between the U.S. and the manufacturer referenced the U.S.-U.K. contract and stated that ultimate delivery of the chips was to be made to the U.K., we found such facts insufficient to show the intent necessary to create third-party beneficiary status.  *See id.*  We also found it significant that the U.S.-U.K. contract set forth a comprehensive set of dispute-resolution procedures, which further demonstrated that the U.S. did not intend for the U.K. to be able to sue the American manufacturer directly.  *See id.*

Applying those principles here, Hencely has not pleaded facts sufficient to plausibly establish that he is an intended third-party beneficiary of the LOGCAP IV contract.  The United States and Fluor did not evidence intent to benefit Hencely, or U.S. soldiers as a class, in the LOGCAP IV contract or its implementing agreements.

First, the LOGCAP IV contract and implementing agreements do not expressly state that they are for the benefit of servicemen.  Further, nothing in those documents purports to confer upon soldiers rights or benefits under the contract.  As our precedent reflects, it is not enough that the United States bought Fluor's goods and services with the intent

ultimately to provide them to soldiers. *See Trimble Navigation*, 484 F.3d at 708; *cf.* Restatement (Second) of Contracts § 313 cmt. a ("Government contracts often benefit the public, but individual members of the public are treated as incidental beneficiaries unless a different intention is manifested.").

Second, nothing in the LOGCAP IV contract or implementing agreements suggests that individual servicemen can sue to enforce its provisions. Hencely cites a regulation incorporated into LOGCAP IV that mentions the possibility of "liabilities of the Contractor to third parties arising out of performing this contract." 48 C.F.R. § 52.232-7(g)(2). But contemplating that a contractor may face some sort of liability to some variety of third party while performing the contract is a far cry from *intending* to confer contractual benefits, and the right to enforce them, on an identified group of individuals. Moreover, LOGCAP IV and its incorporated regulations provide a detailed set of dispute-resolution procedures, none of which contemplate enforcement by third-party beneficiaries.

Third, no other factual allegations in Hencely's complaint support his conclusory assertion that "U.S. soldiers . . . were the intended third party beneficiaries of these contracts." J.A. 1666. Hencely quotes some of Fluor's advertising materials, which state in one form or another that Fluor is proud to support the U.S. military and feels a responsibility to individual soldiers. These extra-contractual statements do not reveal an intent by Fluor, during contract formation, to confer benefits on individual soldiers in the LOGCAP IV contract, nor do they say anything about the intent of the United States, the other contracting party.

Finally, Hencely has identified no decision of any court holding that individual servicemen can sue as third-party beneficiaries to enforce the LOGCAP IV contract or any contract between the U.S. Government and a private military contractor. For all these reasons, we affirm the district court's judgment on the pleadings in favor of Fluor on Hencely's breach of contract claim.

V.

The federal government's interest in preventing military policy and base security from being governed by the laws of fifty-one separate sovereigns is "obvious." *Saleh*, 580 F.3d at 11. This significant federal interest preempts Hencely's tort claims against Fluor arising out of its supervision of Local Nationals at Bagram Airfield under the military's ultimate authority. As for Hencely's contract claim, we have seen no indication that individual servicemen are entitled to sue for breach of the contracts between the U.S. Government and Fluor. The judgment of the district court is affirmed.

*AFFIRMED*

TOBY HEYTENS, Circuit Judge, concurring in part and dissenting in part:

My disagreement is narrow and limited. I agree the political question doctrine does not prevent a court from deciding this case. I agree Hencely was not a third-party beneficiary to Fluor's contract with the government. And I agree Hencely's negligent supervision and negligent control claims are preempted.

I would, however, reverse the district court's grant of summary judgment to Fluor on Hencely's negligent entrustment and negligent retention claims. Here too, I agree the first requirement for preemption is satisfied because Fluor was "integrated into combatant activities" at Bagram Airfield. *In re KBR, Inc., Burn Pit Litig.*, 744 F.3d 326, 351 (4th Cir. 2014) (quotation marks removed). But I think there are genuine disputes of fact relevant to the second preemption requirement—whether the military "retained command authority" over certain types of decisions. *Id.* (quotation marks and alterations removed). In particular, I think a reasonable adjudicator could find that Fluor retained "considerable discretion" over whether to allow employees to access tools they did not need or fire employees for poor job performance. *Harris v. Kellogg Brown & Root Servs., Inc.*, 724 F.3d 458, 481 (3d Cir. 2013). I thus would vacate the district court's judgment in part and remand for further proceedings.